**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case Number 23-cr-55 (JMC)** |
| **KENNETH JAY BONAWITZ,** | : | |
| | : | **Detention Hearing: March 10, 2023** |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF**
**DEFENDANT KENNETH JAY BONAWITZ'S DETENTION**

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, respectfully submits requests that this Court issue an Order detaining

Defendant Kenneth Bonawitz.

**Procedural History**

On January 19, 2023, the District Court for the District of Columbia issued an arrest warrant

pursuant to the filed complaint charging the defendant, Kenneth Jay Bonawitz, with seven counts,

including Assaulting Certain Law Enforcement Officers (in violation of 18 U.S.C. § 111) and

Obstructing Law Enforcement Incident to Civil Disorder (in violation of 18 U.S.C. § 231(a)(3)),

based on two separate assaults on groups of law enforcement officers, and multiple misdemeanor

counts related to his unlawful and disorderly conduct at the U.S. Capitol Grounds and U.S. Capitol

Building.  These charges stemmed from his actions on January 6, 2021, during the timeframe a joint

session of the United States Congress had convened to certify the vote count of the Electoral

College of the 2020 Presidential Election.

On January 26, 2023, the defendant was arrested in the Southern District of Florida on the

arrest warrant mentioned above. On February 3, 2023, the defendant waived his detention hearing

in the Southern District of Florida and elected to have it in the District of Columbia. On February

1

22, 2023, a federal grand jury in the District of Columbia returned an eleven-count indictment charging the defendant with various disorderly conduct offenses, as well as Disorderly Conduct During a Civil Disturbance (in violation of 18 U.S.C. § 231(a)(3)) and six counts of Assaulting Certain Officers (in violation of 18 U.S.C. § 111(a)(1)). [1]  The defendant has not been arraigned on the above charges.

**<u>Legal Standard</u>**

Pursuant to the Bail Reform Act, 18 U.S.C. § 3142 *et seq.*, the Court "shall order" that a defendant be detained pretrial if, after a hearing, the Court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention must be supported by clear and convincing evidence when the justification is safety of the community, 18 U.S.C. § 3142(f), and preponderance of the evidence when the determination is based on risk of flight. *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).

The above provisions thus operate in two steps as follows. First, the judicial officer, based on a "proffer of what the hearing might establish," must ascertain if one of the circumstances enumerated under § 3142(f) is present to "trigger[] a detention hearing." *United States v. Singleton*, 182 F.3d 7, 9, 12 (D.C. Cir. 1999) (holding courts must use categorical approach to determine whether charged offense is a crime of violence triggering a detention hearing, and also discussing the § 3142(f)(2) triggers for detention). The D.C. Circuit has instructed that "[t]he decision whether to hold a hearing occurs based on even less information than a decision to detain or release," and that imposing a "fact-intensive analysis at an earlier stage of the case than Congress appears to have intended" would "blur [the] two distinct statutory inquiries" set forth in sections 3142(f) and (g).

---

[1] Although the complaint included a violation of 18 U.S.C. § 111(a) & (b), the indictment does not. The defendant is now no longer charged with a crime of violence or any other charge listed in 18 U.S.C. § 3142(f)(1)(A).

*See id.* at 12.  In other words, the evidentiary standard to trigger a detention hearing in the first place is lower than the preponderance or clear and convincing evidentiary standards applicable at the detention hearing itself.  *See id.*  If the government proffers evidence sufficient to meet this initial lower evidentiary threshold, the Court must hold a detention hearing. *See id.*; 18 U.S.C. § 3142(f)(2). At this second step in the process, the Court is required to consider the full panoply of factors under § 3142(g) to determine whether there are conditions of release that will reasonably assure the defendant's appearance in court and the safety of any other person and the community. *See Singleton*, 182 F.3d at 9; *see also United States v. Ailon-Ailon,* 875 F.3d 1334, 1336-37 (10th Cir. 2017) (setting forth same two-step process); *United States v. Holmes,* 438 F.Supp.2d 1340, 1341 (S.D. Fla. 2005) (reasoning that, under *Singleton*, a court "should evaluate all the factors in subsection (g) when making its detention determination . . . regardless of whether detention is sought under [§ 3142] (f)(1) or (f)(2)"); *United States v. Plata Hernandez,* 766 Fed. Appx. 651, 656 (10th Cir. 2019) ("The plain language of § 3142(f) pertains to what triggers the requirement that a detention hearing be held, not the factors that guide the detention decision.").

The government seeks the defendant's continued detention pursuant to 18 U.S.C. § 3142 (f)(2)(A), as he poses a serious risk of flight. Under the Bail Reform Act, the government may proceed by way of proffer. *See, e.g.*, *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996); *United States v. Cabrera-Ortigoza*, 196 F.R.D. 271 (S.D. Cal. 2000); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 42 (D.D.C. 2013). The government further submits that because there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community, the integrity of this proceeding, and the defendant's appearance in court, he should remain detained.

**Factual Background**

**I. The Attack on the United States Capitol on January 6, 2021**

The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police (hereinafter, "USCP"). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP officers. Only authorized people with appropriate identification were allowed access inside the. Capitol. On January 6, 2021, the exterior plaza of the Capitol was also closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the Capitol building, and USCP officers were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway and the exterior doors and windows of the Capitol were locked or otherwise secured. USCP officers attempted to maintain order and keep the crowd from entering the Capitol; however, around 2:00 p.m., individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting USCP

4

Officers, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the House of Representatives and Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law.

**II. Conduct Specific to the Defendant**

Starting at around 1:00 p.m. on January 6, 2021, a large crowd began amassing on the West Front of the Capitol.  Between 1:00 p.m. and 2:28 p.m., the crowd became increasingly hostile to the Washington, D.C., Metropolitan Police Department (hereinafter, "MPD") and USCP officers who were attempting to hold the line on the West Front and prevent the crowd from advancing towards the Capitol while the Joint Session was meeting. Shortly before 2:28pm, the officers at the West Front of the Capitol lost the line to the advancing crowd, which broke through on the south side.  The Defendant was among the first of those rioters to push through the collapsed line on the West Front.  The Defendant was dressed in a red "Make America Great Again" hat, a black leather jacket, brown leather shoes, blue jeans, and a red, white, and blue neck gaiter.  The Defendant was also armed with what appears to be an approximately eight-inch hunting knife, which was in a nylon sheath attached his belt on his right hip.

A. Assault Against USCP Officer Z.Y. and USCP Sergeant F.R.

At approximately 2:30 p.m., the Defendant mounted the stage that had been built for the upcoming Inauguration on the West Front. The Defendant mounted the stage, turned south, and

began to run in the direction of a short set of stairs.

USCP Officer Z.Y. and USCP Sergeant F.R. were standing at the base of that short set of stairs.  Just before the platform ended, the Defendant raised both of his arms and hurled himself in the direction of Officer Z.Y. and Sergeant F.R. *See* Figure 1. The Defendant collided with the officers and the weight of his body travelling through the air took both officers to the ground. *See* Figure 2



*Figure 1.*



*Figure 2.*

Multiple officers assisted pulling the Defendant off Officer Z.Y. and Sergeant F.R.  As a result of the Defendant's assault against him, Sergeant F.R. suffered from injuries to his neck and shoulder. While the officers were removing the Defendant, they observed that he had the knife in a

nylon sheath attached to his belt on his right hip. *See* Figure 3. The officers confiscated the knife before releasing him back into the crowd.



*Figure 3.*

On the ground, the Defendant removed his jacket, revealing a gray tee-shirt reading "Getcha some freedom" over a red, long sleeve undershirt. The Defendant then yelled to the officers who were surrounding him following his assault on Officer Z.Y. and Sergeant F.R., stating "What are you guys doing?" The Defendant also removed his red hat, revealing a clean-shaven, bald head. He continued to hold the hat in his hands as he rejoined the crowd of rioters on the West Front as MPD and USCP officers were attempting to re-establish the line against those rioters.

B. Assaults Against Multiple MPD Officers

At approximately 2:31pm, the Defendant, having had his knife removed, was escorted back into the crowd at the West Front. Upon rejoining the crowd, the Defendant again confronted officers at the police line on southern side of the West Front of the Capitol. In the course of approximately seven seconds and less than thirty seconds after he rejoined the crowd, the Defendant assaulted four separate MPD officers in a melee.

1. *Assault #1: MPD Officer E.M.*

Another rioter began to push against MPD Officer E.F. as he and other officers tried to re-establish the line. Multiple MPD officers attempted to assist Officer E.F., including MPD Officer

7

E.M. The Defendant, positioned behind Officer E.M., shoved her, causing her to stumble forward. When Officer E.M. tried to turn to face the Defendant, he wrapped his arms around her from behind, inserted his forearm under her face shield, and pulled upwards on her neck with his forearm, briefly lifting her off the ground and causing her to gag from the pressure on her throat. *See* Figure 4. Officer E.M. was able to struggle free of the Defendant's grip and push herself away from him.



*Figure 4.*

2. *Assault #2: MPD Officer J.R.*

As the Defendant was committing Assault #1, MPD Officer J.R., moved to get past the Defendant to assist Officer E.F. in his altercation with the rioters. As soon as Officer E.M. struggled free of the Defendant's grip, the Defendant swung his left arm and knocked Officer J.R. near his face and neck area, causing him to stumble and fall to the ground. *See* Figure 5.



*Figure 5*

3. *Assault #3: MPD Officer P.N. and an Unidentified MPD Officer*

As the Defendant was engaging in Assault #2, MPD Officer P.N. and an unidentified MPD officer intervened to assist Officers E.F., E.M., and the other officers whom the Defendant and the crowd were assaulting. The Defendant turned in the direction of Officer P.N. and the unidentified MPD officer. The Defendant then pulled his head back, as though preparing to headbutt the unidentified MPD officer. [2] The Defendant also took his right elbow and thrust it into the unidentified MPD officer's abdominal area. *See* Figure 6. As he elbowed the unidentified MPD officer, the Defendant took his left hand, in which he was holding his red hat, and jammed it into the right side of Officer P.N.'s neck and ear area behind his face shield. *See* Figure 7.

The Defendant turned his body in the direction of Officer P.N., locked his hands on the officer's shoulders and began pushing and shoving him for approximately five seconds. *See* Figure 8. The Defendant then released his grip on Officer P.N. but continued flailing his arms and grabbing at the multiple officers around him. Reaching over his right shoulder, the Defendant grabbed a yellow Gadsden flag on a short flagpole from the hands of a fellow rioter and swung the flag over

---

[2] Based upon the body worn camera footage of multiple MPD officers at the scene, the Defendant's head did not make contact with the unidentified officer due Officer P.N.'s shoving the Defendant away from the unidentified MPD officer.

his right shoulder, in an apparent attempt to strike Officer P.N. on the left side of his ribcage. His final assault against Officer P.N. only failed because the original holder of the Gadsden flag maintained his grip on it, thereby impeding The Defendant's swing. The Defendant's assaultive conduct ended after MPD officers pushed him back into the crowd for a second time and deployed chemical agent to his face.



*Figure 6.*



*Figure 7.*



*Figure 8.*

D. Investigation

    1. *Identification of the Defendant*

In early 2022, the FBI received a tip that the Defendant was involved with the riot at the Capitol on January 6, 2021. The case agent met the Defendant outside of his home on March 3, 2022, and questioned him about his involvement with the events of that day. During this non-custodial interview, the Defendant informed the case agent he traveled by bus from Florida to Washington, D.C., for a "one day trip." The Defendant stated that he arrived at the Capitol approximately one hour before the "protest" began and departed via bus at approximately 3:00 p.m. The Defendant further stated that he never went inside the Capitol, and that he did not bring anything in particular, to include weapons, when he traveled to D.C. The Defendant stated that he did get into a physical altercation with two young people as he was leaving D.C., but had no physical altercations with any law enforcement officers.

On April 18, 2022, the FBI received information from a confidential human source working with open-source materials who identified the Defendant as the person who engage in the above-described assaults against USCP Officer Z.Y and Sergeant F.R. on January 6, 2021. This identification was made based upon the Defendant's clothing that day, the distinctive marlin tattoo on his left chest, another distinctive tattoo on his left arm, and his social media.

In May of 2022, in connection with a separate investigation, the Defendant was observed on a Proud Boys meet-up poster that was circulated around South Florida in at that time. In connection with that same investigation, the FBI received information that the person on the Proud Boys meet-up poster was also involved in the violence that occurred at the Capitol on January 6, 2021.

In a publicly available video, the Defendant is interviewed by news media as he is walking away from the Capitol on January 6, 2021. In that video, the Defendant states, "I was up on the stage breaking through the lines. D.C. police maced me, hit me over the head with batons, and was kicking me in the side of the face. That's what your D.C. police—who you are all paying for—you're all paying for this. It's time to stand up." In this same video, when the reporter appears to ask the Defendant his name and where he is from, he replies, "Kenneth Bonawitz. Florida." In another publicly available video, taken in South Florida on or about January 9, 2021, the Defendant, when confronted by a person about the attack on the Capitol, listed up his shirt to show purported bruises and stated, "Look, dude, I was there. This is compliments of the D.C. Police."

2. *Flight*

On or about December 18, 2022, the Defendant's involvement with the January 6, 2021, attack on the United States Capitol was published by a Twitter account dedicated, in part, to exposing those in South Florida who were present at the Capitol on that day. The account published his full name and screenshots from his social media. Based on the FBI's investigation, sometime after January 6, 2021, the Defendant deleted his then-active Facebook.com profile, which the FBI knows to have contained evidence about his presence in Washington, D.C., on January 6. On or about January 10, 2023, the FBI began to search for the defendant upon discovering that he had vacated the apartment where the FBI case agent had interviewed him in March 2022.

Using records from local law enforcement in Florida, the FBI was able to locate an address in Pompano Beach, Florida, where the defendant was believed to be staying. The FBI began to

surveil that address, but never observed the Defendant or any of his known companions coming in or out of the residence at the address. Based upon the FBI's investigation, the government believes him to be living transiently.

Over the course of approximately two weeks, the FBI searched for the Defendant to no avail. During a controlled call with the Defendant on or about January 18, 2022, the Defendant refused to provide his address to the FBI. On January 26, 2023, the Defendant was arrested outside of the United States Post Office in Pompano Beach, Florida, after the FBI staged another controlled call in which the agent informed him that he had a package at the post office location. Upon being arrested, the Defendant stated to the arresting agent, "I respect law enforcement and what you all do. I never touched an officer—I never physically touched an officer. I went there to protect the elderly. I got caught up in the moment."

In his interview with Pre-Trial Services, the Defendant provided the address which the FBI had been monitoring during his period of evasion. At no point during their time monitoring the residence did any FBI agent see the Defendant or any of his known associates entering or leaving the residence.

## <u>Argument</u>

### I. A Hearing Pursuant to Section 3142(f) is Warranted

The facts in this case demonstrate that the government has met the minimal showing required to trigger a hearing under Section 3142(f). Applying the appropriate evidentiary standard, the government has provided sufficient facts about what the hearing may establish regarding the Defendant's risk of flight and the 3142(g) factors. Singleton, 182 F.3d at 9 and 12.

There are four factors under § 3142(g) that the Court should consider and weigh in determining whether to detain a defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and

characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. §3142(g). As discussed in more detail above, the Court may also consider whether the defendant poses a serious flight risk or a serious risk of obstructing justice. *See* 18 U.S.C. § 3142(f)(2); *Robertson*, 608 F. Supp. 2d at 92. In consideration of these factors, the government respectfully submits that there are no conditions or combinations of conditions that can effectively ensure the safety of any other person and the community, the integrity of this proceeding, or the defendant's appearance in court.

## II. Risk of Flight

The Defendant poses an ongoing risk of flight. The Defendant engaged in violent assaults against six different law enforcement officers on January 6, 2021, during the course of a violent riot which sought to prevent the peaceful transition of power. After the riot, the Defendant did his best to obfuscate, destroy evidence, and evade capture. When the FBI first contacted the Defendant, he lied about his conduct that day. After January 6, the Defendant deleted his Facebook account where he had previously posted at least three photos that showed him either travelling to D.C. or on the National Mall. Finally, and most importantly, when his identity as someone who engaged in violence on January 6, 2021, was revealed to the world in late 2022, he fled. Based on the FBI's investigation, the government believes that he is still being untruthful about his current residence, that he is in fact living transiently, and that he continues to try and evade providing the truth to law enforcement as best he can—even while in custody. The Defendant has demonstrated himself not to be someone who, in the face of overwhelming evidence of his guilt, will come back to this Court of his own free will when he is facing a substantial period of incarceration for his crimes on January 6. For these reasons, the government submits that the defendant is a demonstrated flight risk by a preponderance of the evidence and thus should continue to be detained pending trial. *Simpkins*, 826 F.2d at 96.

### III. The Section 3142(g) Factors

The application of the Section 3142(g) Factors in this case further support the conclusion that the Defendant poses a risk of flight. The serious nature of the defendant's assaults on law enforcement officers, the overwhelming weight of the evidence against him, the Defendant's association with anti-government extremists, and the ongoing danger that he poses to the community all demonstrate that the Defendant has ample cause to abscond from these proceedings in the face of the lengthy term of incarceration that he now faces.

A. Nature and Circumstances of the Offenses Charged

With regard to this particular Defendant, the nature and circumstances of the offense charge bear directly upon his risk of flight. On January 6, 2021, the defendant assaulted multiple law enforcement officers attempting to protect the Capitol and members of Congress inside. His role in contributing to the chaos that day is not hyperbole—the defendant himself can be seen on body worn camera footage as part of a violent crowd as they collectively assaulted the officers.

For his first assault, the Defendant chose to target two officers who were standing away from the crowd—two officers who were taking a moment away from the chaos. The Defendant can be seen on a body worn camera video running at full speed and then leaping from the stage and dive-tackling two officers. During this first assault, the Defendant was armed with, but did not use, a large hunting knife in sheath on his belt. This fact is important in the context of January 6, because as Chief Judge Howell has noted, "[a] defendant's carrying or use during the riot of a dangerous weapon,' is a factor the distinguishes more culpable defendants." *United States v. Chrestman*, 525 F. Supp. 3d 14, 26 (D.D.C 2021).

But the defendant's assaults against officers were not limited to this discrete instance. After being released back into the crowd, he had the opportunity to walk away from the scene, but instead he chose to again physically assault law enforcement officers who were attempting to hold the

Capitol from the riotous crowd. Less than one minute after being released into the crowd, the Defendant re-entered the crowd and engaged in a melee with a group of officers, ultimately assaulting four of them.

The Defendant's assault against Officer E.M. is of special note. The Defendant is substantially larger than Officer E.M., standing approximately a foot taller than her and outweighing her substantially. When Officer E.M. intervened to assist her fellow officers against the mob, the Defendant came up behind her and placed her in a chokehold by bracing his forearm across her neck and literally lifting her off the ground. In Officer E.M.'s body worn camera, her gagging noises can be heard as her feet lose contact with the ground.

On January 6, the Defendant joined a riotous mob as they sought to disrupt the peaceful transition of power. The defendant personally assaulted six law enforcement officers, including two who were standing to the side away from the mob just prior to the Defendant's assault and one— whom he placed in a chokehold—whom he is substantially larger than. As a result, the nature and circumstances of the charged offenses overwhelmingly weigh in favor of detention. *Chrestman*, 525 F. Supp. 3d at 27 ("The conduct of a defendant who injured, attempted to injure, or threatened to injury others […] is more troubling than the conduct of a defendant who, though, unlawfully present in a restricted area, merely wander the premises.")

In this case, the nature and character of the offense strongly support the conclusion that the Defendant has lied to law enforcement multiple times. When he was first spoken to by the FBI, he denied any involvement with the violence against law enforcement officers on January 6. He further lied about bringing any weapons with him to the Capitol. Upon being arrested, he again lied to the FBI and said that he "never physically touched a law enforcement officer." At every turn, the Defendant has been evasive and untruthful about his serious violent conduct that day. Someone who so readily lies cannot be trusted to return to court.

B. Weight of the Evidence Against the Defendant

The second factor to be considered, the weight of the evidence, also clearly favors detention. As noted above, the defendant is captured attacking and assaulting law enforcement officers during two discrete time periods. Each of these assaults is captured on body worn camera from multiple angles. Moreover, based upon his appearance and clothing, it is plainly apparent that the Defendant, not some other member of the crowd, is the one who assaulted each of these six officers. Finally, there is no doubt as to the Defendant's identity because videos captured by the media and on social media corroborate the identification of the defendant, including the video in which he identifies himself by name and gives his home state. This factor overwhelmingly favors detention.

C. Defendant's History and Characteristics

Prior to his arrest, the Defendant made efforts to delete evidence. This fact further supports his risk of flight. The defendant has gone to great lengths to eliminate whatever evidence he controls of his participation in the events of January 6. These efforts to delete evidence show that he will continue, at every opportunity, to obscure the truth about his conduct that day and evade the law.

D. Danger to the Community

The fourth factor, the nature and seriousness of the danger to any person or the community posed by a defendant's release, also weighs in favor of the defendant's detention. The charged offenses involve assaultive conduct as part of a violent. The danger the defendant caused as an active member of a violent mob cannot be understated. The entry of likely hundreds of rioters into the Capitol building and their destructive actions can be attributed, at least in part, to his role in overwhelming law enforcement at that crucial moment at 2:30pm when they were attempting to re-establish the police line on the West Front of the Capitol. While thankfully it does not appear the officers he assaulted suffered serious injuries, his actions contributed to the overwhelming of law

17

enforcement and their retreat from open spaces where they could not hold the mob at bay to more confined spaces such as the Lower West Tunnel. His actions and statements illustrate that he is a danger to our society and a threat to the peaceful functioning of our community.

## Conclusion

For the above reasons, the Government submits that there is clear and convincing evidence that the defendant satisfies all of the Section 3142(g) Factors for pre-trial detention and that he poses a risk of flight. Therefore, the government requests that he be held pending his trial.

Respectfully submitted,

DATED: March 9, 2023

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Sean P. McCauley*
Sean P. McCauley
New York Bar No. 5600523
Assistant United States Attorney
601 D Street NW
Washington, DC 20579
(202)252-1897
Sean.McCauley@usdoj.gov