**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-55 (JMC)** |
| **KENNETH JAY BONAWITZ,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kenneth Jay Bonawitz to 71 months of incarceration, the high end of the Guidelines range of 57 to 71 months, three years of supervised release, $2,000 in restitution, and a mandatory assessment of $300. A sentence of 71 months is warranted because Bonawitz, who came to the Capitol prepared for violence and armed with a knife, was one of the most violent January 6 rioters. Bonawitz assaulted at least six officers on the West Plaza. His attacks included hurling himself at officers and tackling them to the ground, and placing one officer in a chokehold and lifting her up by her neck. Bonawitz's attacks injured one officer so severely that the officer has now been forced to retire from the United States Capitol Police. Moreover, since pleading guilty in this case, Bonawitz has specifically disavowed portions of the statement of offense to which he swore, and, in doing so, has demonstrated that he still takes pride in his conduct on January 6, 2021, including his assaults against multiple police officers. Bonawitz's uniquely violent conduct, his post-plea

1

denial of responsibility, and obvious pride in his crimes merits a sentence at high-end of his guidelines range.

## I.      INTRODUCTION

The defendant, Kenneth Bonawitz, a member of the Miami chapter of the Proud Boys, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Bonawitz, who stands six and a half feet tall and weighs nearly three hundred pounds, left his home in Pompano Beach, Florida, on January 5, 2021, on an overnight bus to Washington, D.C. After the rally, Bonawitz went to the West Front of the United States Capitol and joined the growing crowd of rioters who were agitating against the police line in the West Plaza. At 2:28 p.m., Bonawitz and other rioters overran the Metropolitan Police Department (hereinafter, "MPD") and United States Capitol Police Officers (hereinafter, "USCP") who had been holding the line against the rioters. At this crucial moment when police were attempting to hold thousands of

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

surging rioters back, Bonawitz mounted the stage that had been built for the upcoming inauguration. He then ran the length of the stage, raised his arms, threw himself into the air as the stage ended, and used his outstretched arms and considerable mass to tackle two USCP officers who were standing at the base of a short set of stairs. After this first set of assaults, officers confiscated an eight-inch knife that Bonawitz had been carrying in a sheath on his hip. When he was released back into the crowd, Bonawitz confronted officers who were attempting to reestablish the line. In the span of ten seconds, Bonawitz assaulted four officers by shoving, pushing, and punching them, as well as by placing one officer in a chokehold and lifting her off the ground.

The government recommends that the Court sentence Bonawitz to 71 months of incarceration for his multiple counts of conviction, which is within the Guidelines' range of 57-71 months, which the government submits is the correct guidelines range. A 71-month sentence reflects the seriousness of Bonawitz's multiple assaults and renunciation of the facts he swore to in his statement of offense.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021, Attack on the Capitol

The government refers the court to the Statement of Offense in this case, ECF 56, for a summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.   Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the Capitol on January 6, 2021, possible. Initiated by the most fervent smaller

groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the police defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Figure 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but USCP officers were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 p.m., a crowd began to gather against

the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Figure 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Figure 1. They flooded the area labeled "Lower West Plaza" Area C on Figure 1, pushing against the barricade there.



*Figure 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Figure 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 p.m., MPD officers responding to USCP officers' calls

for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



*Figure 4: Breakthroughs in the defensive line at 2:28 p.m. on both the left and right flanks (top) caused the entire police line to collapse by 2:29 p.m. and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage between 2:29 p.m. and 2:34 p.m. (bottom).*

### C.  Bonawitz's Role in the January 6, 2021 Attack on the Capitol

#### 1.  *Travel to D.C. and Early Morning Activities*

On January 5, 2021, Bonawitz boarded a bus in south Florida that was set to drive through

the night and arrive in Washington, D.C., the following morning. This bus had been chartered to travel from the Miami area to Washington, for the specific purpose of transporting people to the "Stop the Steal" rally. During this bus ride on January 5, Bonawitz posted a photo to his Facebook account captioned "On our way to DC…FIGHT FOR TRUMP." *See* Figure 5.



*Figure 5.*

Bonawitz arrived in D.C. on the morning of January 6, and had a verbal altercation with MPD officers because he refused to wear a mask in . *See* Gov. Ex. 1. After this argument, Bonawitz walked towards the White House, where the former president's "Stop the Steal" rally was taking place. Bonawitz remained on the National Mall and did not enter the Ellipse.[2]

As the rally was still taking place and while President Trump was speaking, Bonawitz had

---

[2]  The crowd that entered the Ellipse had to pass Magnetometers. Because Bonawitz had two knives with him, it is unlikely that he would have been able to clear the Magnetometers and enter the Ellipse. Perhaps for this very reason, Bonawitz remained on Constitution Avenue in the vicinity of 17th Street NW for a substantial portion of the "Stop the Steal" rally.

yet another verbal confrontation, this time with counter-protesters and other rally attendees who were there in support of the former president. *See* Gov. Ex. 2 starting at 46:02. When another rally attendee, intervened to stop a growing confrontation between two supporters of the former president, Bonawitz interrupted, stating to the other attendee, "I don't care. He's being disrespectful. […] We ain't going nowhere, motherfucker. We're tired of being nice. We're tired of being nice! We're tired of fucking people like that. So, I ain't being a peaceful no more. I don't care if he's being peaceful—he's being disrespectful to our president. So, fuck that." *Id.* at 47:30-49:25; *see also* Figure 6.



*Figure 6. Bonawitz is at left in the leather jacket, red hat, and neck gaiter.*
*The other attendee is at right in the gray hooded sweatshirt and gray canvas jacket.*

When the other attendee responded to Bonawitz about how it was not necessary to physically confront someone because they did not support the former president, Bonawitz began to scream, "Bullshit! I don't care. We're done being nice. We're done turning the other fucking cheek. We're done turning the other fucking cheek! He disrespected my ass with what he said on the damn sign!" *Id.* at 49:28-49:52. The other attendee again tried to calm Bonawitz down by saying that it was "just a sign" and Bonawitz responded again, "I don't care. And antifa is a sign.

And BLM is a sign. Bah! Bah! Bah! I don't care. That's disrespectful point. I am tired of it. You can put it on camera all you want. We are done being calm! Calm has gotten us right where we are at right now. It's time to fucking stand up and do something about it! Letting that douchebag walk around with that fucking sign is disrespectful for everyone who is fucking here." *Id.* at 49:52-50:32. Bonawitz then apologized to the other attendee for brushing against him but continued to berate him: "I am done turning the other fucking cheek!" *Id.* at 50:32-50:40. This confrontation between Bonawitz and the other attendee took place at approximately 12:24 p.m.[3]

Bonawitz then moved slowly with the crowd down Pennsylvania Avenue in the direction of the Capitol. *See* Figure 7.



*Figure 7.*

   *2. Bonawitz's Assaults on Multiple Federal Officers*

As described in II.B above, between 12:55 p.m. and 2:28 p.m., the West Plaza of the United States Capitol was the scene of a sustained siege against USCP and MPD officers who were trying

---

[3] While Bonawitz is confronting the other attendee, the former president can be heard speaking to the crowd. Using the known times of when the former president began and ended speaking, the government was able to determine the approximate time that this confrontation occurred.

to hold the line against an ever-swelling crowd that was growing increasingly violent with each passing minute. At 2:28 p.m., Bonawitz was near the front line of rioters who were agitating against police. When the police line was overrun, Bonawitz and the other rioters flooded into the Upper West Plaza past the bicycle rack barricades and police officers who stood in their way. Bonawitz was one of the first rioters to enter the Upper West Plaza once the line fell on the north side.

Immediately upon entering the Upper West Plaza, Bonawitz mounted the stage structure that had been built, three to four feet above ground level, for the inauguration. From his elevated vantage point, Bonawitz saw officers being harassed and assaulted all around him by other rioters. Bonawitz stood on the stage for several seconds before he turned south and began to charge at the police. Bonawitz ran nearly the entire length of the stage towards USCP Officer Z.Y. and Sergeant F.R., who were standing at the base of a short set of stairs. In the final seconds before he reached the two officers, Bonawitz raised both of his arms and hurled his considerable mass through the air directly at them. *See* Gov. Ex. 3.



*Figure 8. Screenshot from Gov. Ex. 3 at 00:37. Bonawitz is circled in red.*
*Officer Z.Y. is indicated with a yellow arrow. Sergeant F.R. is indicated with a blue arrow.*

Bonawitz collided with the officers, striking Sergeant F.R. squarely on his neck. The considerable weight of his body and the momentum Bonawitz had built up by running at them brought both officers to the ground. *See* Figure 9. Sergeant F.R. was left semi-conscious by Bonawitz's assault and, as he was taken to the ground, struck the top of his spine on the pavement.[4]



*Figure 9. Gov. Ex. 3 at 00:38.*

As a result of Bonawitz's aerial assault, Sergeant F.R. suffered serious injuries to his neck, shoulder, knees, and back. *See* Attachment A, Victim Impact Statement, Sergeant F.R. These injuries persist to this day, have left Sergeant F.R. unable to carry or use a weapon, forced Sergeant F.R. to take limited duty with the Capitol Police, and, after twenty years of service, are the reason that he retired from the Capitol Police on December 31, 2023. *Id.*

Multiple officers ran to provide assistance to Sergeant F.R. and Officer Z.Y. While the

---

[4] Although Sergeant F.R. immediately felt pain because of this incident, it was not until much later that he realized the scale of his injuries. On January 6, 2021, after he re-oriented himself following Bonawitz's attack, Sergeant F.R. continued protecting the Capitol. Shortly after being attacked by Bonawitz, Sergeant F.R. entered the Lower West Terrace tunnel, where he was part of the sustained efforts by police officers to hold back the rioters for nearly three hours.

officers were helping Officer Z.Y. and Sergeant F.R., they saw the approximately eight-inch

hunting knife that Bonawitz carried in a sheath on his right hip. *See* Figure 10.



*Figure 10.*

Unable to place Bonawitz under arrest due to the escalating chaos unfolding around them, the

officers removed the weapon from Bonawitz's hip to minimize the threat he posed and prepared

to release him back into the crowd.

While he was still on the ground after having tackled the two officers, Bonawitz removed

his jacket, revealing a gray tee-shirt reading "Getcha some freedom" over a red, long sleeve

undershirt. Bonawitz also removed his hat. Bonawitz repeatedly questioned why the police were

defending the Capitol, yelling "What are you guys doing?" multiple times at the officers who

surrounded him and removed his knife After removing his knife officers escorted Bonawitz back

into the crowd on the south side of the Upper West Plaza where police officers were attempting to

reestablish a police line against the increasingly angry and violent crowd. Immediately upon

rejoining the crowd, Bonawitz began to resist the officers' efforts to re-establish the line and again

14

engaged in physical violence, assaulting four separate MPD officers in a matter of seconds.

The melee began when another rioter pushed against MPD Officer E.F. as he and other officers tried to re-establish the line. As other rioters joined in the attack on Officer E.F., several MPD officers attempted to assist him, including MPD Officer E.M. As Officer E.M. came to Officer E.F.'s aide, Bonawitz, who was behind Officer E.M., shoved her in the back, causing her to stumble forward. *See* Gov. Ex. 4 at 02:02-02:03. As Officer E.M. stumbled, Bonawitz stepped forward and closed the gap between them. He then wrapped his arms around her from behind, inserted his forearm under her face shield, and pulled upwards on her neck with his forearm, lifting her off the ground. *See* Gov. Ex. 5 at 01:08 – 01:12.



*Figure 11. Screenshot from Gov. Ex. 5 at 1:10.*

The pressure Bonawitz applied to her throat caused Officer E.M. to choke and gag as he lifted her off the ground. *See* Gov. Ex. 4 at 02:02- 02:04.

While Officer E.M. was still in Bonawitz's chokehold, MPD Officer J.R. tried to move

15

past Bonawitz to assist Officer E.F. in his ongoing battle with other rioters. As soon as Officer E.M. broke free of Bonawitz's grip, Bonawitz used his now-free left arm to strike Officer J.R. near his face and neck area, causing him to stumble and fall to the ground. *See* Gov. Ex. 4 at 02:05.



*Figure 12. Screenshot from Gov. Ex. 4 at 2:05.*

After striking Officer J.R., Bonawitz turned in the direction of Officer P.N. and an unidentified MPD officer who were assisting other officers. Bonawitz then pulled his head back, as though preparing to headbutt the unidentified MPD officer, but was foiled in this effort when Officer P.N. shoved him away. *See* Gov. Ex. 5 at 01:12-01:16. Bonawitz was undeterred. He took his right elbow and thrust it into the unidentified MPD officer's abdominal area. *See* Gov. Ex. 4 at 02:08-02:11.



*Figure 13. Screenshot from Gov. Ex. 4 at 02:08.*

Nearly simultaneously as he was elbowing the unidentified MPD officer with his right arm, Bonawitz jammed his left hand behind Officer P.N.'s face shield and into Officer P.N.'s right ear. *See* Gov. Ex. 4 at 02:08-02:10.



*Figure 14. Screenshot from Gov. Ex. 4 at 02:09.*

17

After striking Officer P.N. near his right ear, Bonawitz turned his body fully in the direction of Officer P.N., locked his hands on the officer's shoulders and began pushing and shoving him. *See* Gov. Ex. 5 at 01:14-01:18.



*Figure 15. Screenshot from Gov. Ex. 5 at 01:15).*

After Bonawitz released his grip on Officer P.N., he continued flailing his arms and grabbing at the officers around him. Reaching behind him, Bonawitz grabbed a yellow flag on a short flagpole from a fellow rioter and swung it over his right shoulder, towards Officer P.N.'s ribcage. This assault against Officer P.N. failed because the original holder of the flag maintained his grip on it, thereby impeding Bonawitz's swing. However, during Bonawitz' attempted strike against Officer P.N. with the flag, Officer P.N.'s body worn camera captured what appears to be a folding, yellow utility knife in Bonawitz's front left pocket. *See* Figure 16.

18



*Figure 16.*

Bonawitz's attacks did not stop until MPD officers pushed him back into the crowd for a second time and deployed chemical agent to his face. *See* Gov. Ex. 5 at 01:21-01:25. From start to finish, Bonawitz assaulted these four officers in the span of approximately seven seconds.

### 3. *Bonawitz's Egress from Capitol Grounds and Media Interviews*

Soon after being sprayed, Bonawitz made his way back through the crowd away from the Capitol in the direction of the Maryland Walkway and the Garfield Circle. *See* Figure 1. As he left Capitol Grounds, Bonawitz stopped for two interviews with media outlets. In the first interview, Bonawitz stated, "I was up on the stage breaking through the lines. D.C. police maced me, hit me over the head with batons, and was kicking me in the side of the face. That's what your D.C. police—who you are all paying for—you're all paying for this. It's time to stand up." In this same video, when the reporter appears to ask Bonawitz his name and where he is from, he replies, "Ken Bonawitz. Florida." *See* Gov. Ex. 6. In a second interview, Bonawitz stated, "I got up. I broke

through. D.C. police sprayed me, maced me, beat me in the head with batons, kicked me in the side of the head, and hit me on the back with batons. That's what the DC police is willing to do the American to support these sons of bitches." *See* Gov. Ex. 7 at 00:07-00:35. As he made the reference to "these sons of bitches," Bonawitz indicated in the direction of the Capitol and the lawmakers inside. Sometime after this second interview, Bonawitz departed Washington. A few days later, Bonawitz appeared in another video published to Facebook by a private citizen that appears to have been taken in South Florida on or about January 9, 2021.   In that video Bonawitz, who was attending yet another rally in support of the former president, when confronted by a person about the attack at the Capitol, lifted up his shirt to show purported bruises and stated, "Look, dude, I was there. This is compliments of the D.C. Police."

**D.  Bonawitz's March 2022 Interview with the FBI**

On March 4, 2022, in response to a tip that Bonawitz had been present at the Capitol, FBI agents interviewed Bonawitz outside of his home in Pompano Beach, Florida. During this interview, Bonawitz was not in custody and was thus not advised of his *Miranda* rights. Bonawitz informed the FBI agents that he travelled from Florida to Washington, D.C., via bus so that he could participate in the protests at the United States Capitol that were scheduled for January 6, 2021. Bonawitz described it as a "one day trip" and that he went because "it was [his] right." Bonawitz refused to state with whom, if anyone, he travelled to Washington. Bonawitz stated that he got to D.C. approximately one hour before the protests began and left around 3:00 p.m. He claimed that he went to the Capitol but that he did not go inside the building or enter the restricted grounds. Bonawitz also denied bringing "anything in particular" with him to the Capitol. Bonawitz

20

claimed that he was "tear-gassed and pepper-balled" during the protest but did not mention anything about any altercations with police officers. However, he did claim that he got into a physical altercation with "two young people at the bus departure area."

### E. Bonawitz's "Flip the Switch" Interview

Less than two months after his guilty plea, on or about October 3, 2023, Bonawitz gave an interview to an internet program known as "Flip the Switch w/ Jenn." *See* Gov. Ex. 8 ("Flip the Switch w/ Jenn: Special Guest Kenneth Bonawitz 'Coach'", October 2023);[5] *see also* Attachment C (unofficial transcription). In that interview, the defendant made statements which contradict the video evidence and contradict the statement of offense to which he swore and which formed the basis of his plea. As of November 6, 2023, the video had been viewed 2,580 times.

In the interview, Bonawitz, referring specifically to his conduct on January 6, stated, "My nature is to talk first and get the situation under control before violence. But if you push me to violence I will act. *I never threw any punches. I never elbowed anybody or choked anybody. Or anything to that. That's all made up stuff. They can lie.*" "Flip the Switch" at 10:52 (emphasis added). This statement directly contradicts ¶17 of statement of offense in which Bonawitz swore that, "[he] wrapped his arms around [Officer E.M.'s] neck from behind, inserted his forearm under the face shield of her helmet, and pulled upwards on her neck with his forearm, briefly lifting her off the ground and causing her to gag from the pressure on her throat." This statement is also inconsistent with his admissions in ¶16 and ¶18 of the statement of offense in which he

---

[5] The government contacted the Defendant's attorneys on November 6, 2023, to inform them about the existence of this interview. As of at least November 13, 2023, the interview was no longer publicly available.

acknowledged "assaulting" additional MPD officers. The defendant also omitted and minimized his assaults against USCP Sergeant F.R. and USCP Officer Z.Y. when he stated, "And you know, I got into a little bit of a rugby match with a couple of officers and…uh…that was about all." *Id.* at 9:06.

In the interview, Bonawitz expressed incredulity at the term "insurrection" being used to describe the events of January 6, 2021, stated, "An insurrection? An *unarmed* insurrection? C'mon! People, please!" *Id.* at 17:00-17:24 (emphasis added). This statement, which asserts that none of the rioters on January 6 were armed, contradicts ¶10 of the statement of offense in which Bonawitz admitted that "[he] was also armed with what appears to be an approximately eight-inch hunting knife, which was in a nylon sheath attached [to] his belt on his right hip." This statement also contradicts ¶14 of the statement of offense, which describes how officers discovered the defendant to be armed with the knife.

Bonawitz also repeatedly blamed his own violent actions on the police officers who were defending the Capitol that day. *See, e.g.*, *id.* at 07:16-07:46 "(You know, until you get down there—when I turned that corner and got close enough to the Capitol to see what's going on, I was in disbelief. To see the brutality of the officers against unarmed protestors was amazing. I mean, it was—I couldn't believe it."); *see also id.* at 7:47-8:14, 18:35-19:17, and 20:08-21:04. He suggested that the events of January 6, including his own violent conduct, were caused by outside agitators. *Id.* at 4:56-5:26. Specifically, Bonawitz asserted that one of these outside agitators was the other attendee, who Bonawitz described as the "bigger black guy," with whom he had a confrontation earlier in the morning. Bonawitz asserted that that "they"—presumptively referring

to the federal government—placed this person in the crowd as an agitator to "trigger people" in the crowd, and "to get them riled up or to get them angry." *Id.* at 05:22-05:27. He claimed that he "fell right into the trap," which he described as the "perfect set-up." *Id*. Towards the end of his interview, Bonawitz emphatically agreed with the interviewer when she said of these "agitators," "And I guarantee you they're sitting in their cushy apartments eating popcorn and watching movies and shit like that. They're' just chillin'. Nothing happened to them." *Id.* at 23:20-23:49.[6]

## II.    THE CHARGES AND PLEA

On February 22, 2023, a grand jury returned an indictment charging Bonawitz with eleven counts, including Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One), Assaulting, resisting, or impeding certain officers or employees (Officer F.R.), in violation of 18 U.S.C. § 111(a)(1) (Count Two), and Assaulting, resisting, or impeding certain officers or employees (Officer E.M.), in violation of 18 U.S.C. § 111(a)(1) (Count Four). On August 17, 2023, Bonawitz was convicted of those offenses based on a guilty plea to Counts One, Two, and Four entered pursuant to a plea agreement.

## III.    STATUTORY PENALTIES

Bonawitz now faces sentencing on Counts One, Two and Four. As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Officer, on Count One, Bonawitz faces a maximum of five years of imprisonment, three years of supervised release, a fine

---

[6] The other rally attendee with whom Bonawitz had this confrontation has been identified as Philip Anderson. On August 29, 2023, Anderson was arrested in connection with the January 6, 2021, riot at the United States Capitol. He was charged with Civil Disorder in violation of 18 U.S.C. 231(a)(3), Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), and related charges. *See United States v. Philip Anderson*, 23-mj-233 (ZMF).

of up to $250,000, restitution, and a mandatory $100 assessment. On each of Counts Two and Four, Bonawitz faces a maximum of eight years of imprisonment, three years of supervised release, a fine of up to $250,000, restitution, and a $100 special assessment.

## IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The appropriate offense level computations for Counts One, Two, and Four, before any grouping analysis under Part D of Chapter 3 or any credit for acceptance of responsibility are:

**Count One: 18 U.S.C. § 231(a)(3) – Civil Disorder**

| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
|---|---|---|
| Specific Offense Characteristic – Physical Contact | +3 | U.S.S.G. § 2A2.4(b)(1): "the offense involved physical contact." [7] |
| Total | 17 | |

[7] A typographical error in the plea agreement excluded this specific offense characteristic, however the total offense guidelines level for Count One was correctly identified as being 17. This error was purely typographical and does not change Bonawitz's total sentencing guidelines calculation before any adjustment for acceptance of responsibility.

**Count Two: 18 U.S.C. § 111(a)(1) – Assaulting, Obstructing, Interfering, or Impeding Certain Officers (USCP Sergeant F.R.)**

| | | |
|---|---|---|
| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
| Specific Offense Characteristic – Physical Contact | +3 | U.S.S.G. § 2A2.4(b)(4): "the offense involved physical contact."[8] |
| Cross-reference: | 14 | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." <br><br> U.S.S.G. § 2A2.2, cmt. n.1(D) defines "Aggravated assault" to include "a felonious assault that involved … (D) an intent to commit another felony." Here, Bonawitz's assault on officer F.R. was conducted with the intent of obstructing officers during a civil disorder, a felony in violation of 18 U.S.C. 231(a)(3), as charged in Count One. |
| Specific Offense Characteristic – Official Victim | +6 | U.S.S.G. § 3A1.2(b): "If the victim was a government officer or employee" and "the offense of conviction was motivated by such status" and the applicable Chapter Two guideline is from Chapter Two, Part A, then "increase by six levels." <br><br> Officer F.R. was a government employee at the time of the assault and Bonawitz's assault was motivated by the fact that Officer F.R. was doing his job as a government employee at the time. |
| Specific Offense Characteristic – Bodily Injury | +3 | U.S.S.G. § 2A2.2(b)(3)(A): If the victim sustained bodily injury, add three levels <br><br> As a result of Bonawitz's aerial assault, Sergeant F.R. suffered serious injuries to his neck, shoulder, knees, and back. These injuries persist to this day, have left Sergeant F.R. unable to carry or use a weapon, forced Sergeant F.R. to take limited duty with the Capitol Police, and, after twenty years of service, are the reason that he is retiring from the Capitol Police on December 31, 2023 |
| Total | 23 | |

---

[8] A typographical error in the plea agreement identified this language as being contained in Subsection 4 rather than Subsection 3. The appropriate subsection is U.S.S.G. § 2A2.2(b)(3)(A).

**Count Four: 18 U.S.C. § 111(a)(1) – Assaulting, Obstructing, Interfering, or Impeding Certain Officers (MPD Officer E.M.)**

| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Cross-reference: | 14 | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)." <br><br> U.S.S.G. § 2A2.2, cmt. n.1(D) defines "Aggravated assault" to include "a felonious assault that involved … (D) an intent to commit another felony." Here, that other felony is the 18 U.S.C. 231(a)(3) offense in Count One. |
| Specific Offense Characteristic – Official Victim | +6 | U.S.S.G. § 3A1.2(b): "If the victim was a government officer or employee" then "increase by six levels." |
| Total | 20 | |

Counts 1 and 2 are grouped (Group One) because the assault in Count 2 embodies conduct that is treated as a specific offense characteristic to the guideline applicable to Count 1. *See* U.S.S.G. § 3D1.2(c). While Count 4 also embodies conduct that is treated as a specific offense characteristic to Count 1, Application Note 5 to U.S.S.G. § 3D1.2 provides that where multiple counts can be treated as an aggravating factor for another count, only "the count representing the most serious of those factors is to be grouped." Accordingly, Count 4 is a separate group (Group Two). Pursuant to U.S.S.G. § 3D1.4, one unit is assigned for Group One, and another for Group Two, resulting in two additional levels, and a total combined offense level of 25. The Probation Office calculated Bonawitz's criminal history as category I, which is not disputed. PSR ¶ 59.

**Bonawitz Is Not Entitled To Any Reduction For Acceptance Of Responsibility**

In the plea agreement, the parties agreed that, subject to certain conditions, Bonawitz should receive a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) & (b).   Plea Agreement at 3-4. Among the conditions contained in the plea agreement

is that Bonawitz demonstrate acceptance of responsibility not just at the time of his plea, but also during the period between his plea and his sentencing. The agreement specifically states that the government would only agree to the 2-level reduction under § 3E1.1 if the defendant "clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through [his] allocution, adherence to every provision of this agreement, *and conduct between entry of the plea and imposition of the sentence*." Plea Agreement at 3-4 (emphasis added).

However, after signing the plea agreement letter and accompanying statement of offense and entering his plea of guilty, Bonawitz made the public statements described above in II.E in which he specifically renounced material facts contained in his statement of offense. Section 3E1.1(a) provides that if a defendant "clearly" demonstrates acceptance of responsibility for his offense, the offense level can be decreased by two levels. If a defendant qualifies under § 3E1.1(a), then an additional 1-level decrease is available upon the government's motion in cases where the defendant's offense level is calculated to be 16 or more. *See* U.S.S.G. § 3E1.1. While entry of a guilty plea and admitting the conduct comprising the offense of conviction and all relevant conduct is "significant" evidence of acceptance of responsibility, such evidence can be outweighed by "conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G § 3E1.1, cmt. 3. For that reason, the Sentencing Guidelines specifically state that "[a] defendant who enters a guilty plea is not entitled to an adjustment under § 3E1.1 as a matter of right." *Id.*

Bonawitz, by making public statements after entering his plea of guilty that directly contradict the sworn statements in his statement offense, has failed to clearly demonstrate acceptance of responsibility. In this interview that was published to the internet and viewed

thousands of times, the defendant denied the facts that established his assault against Officer E.M., claimed the assault on the Capitol was "unarmed" although he himself was armed with a large knife, and mischaracterized his dive-tackle attack on Sergeant F.R. as a "rugby match." These statements indicate that he has not clearly accepted responsibility for his conduct despite the admission of guilt he made during the plea hearing. Courts in this district have found that, when a defendant makes statements between entering a plea of guilty and his sentencing that contradict the facts contained in the statement of offense, the defendant should not receive any credit for acceptance of responsibility. *See United States v. Palmer*, 21-cr-328 (TSC), 12/17/21, Sentencing Tr. at 10-17 (upholding the Probation Office's denial of credit for acceptance of responsibility based on a January 6 defendant causing a statement to be posted on the internet which contradicted his statement of offense).

In light of his conduct after pleading guilty, Bonawitz has not *clearly* shown that he has accepted any responsibility for his actions on January 6. In fact, he has specifically denounced certain portions of the statement of offense to which he swore. As such, no reduction for acceptance of responsibility is warranted in this case. Therefore, Bonawitz's offense level remains at 25, yielding a sentencing range of 57-71 months.

## V.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As discussed above, Bonawitz's violent conduct on January 6, 2021, was part of a massive

28

riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States to the brink of a Constitutional crisis. The attack on the Capitol was a norm shattering event that, by its very nature, defies comparison to other events in American history much less isolated instances of criminal behavior by individuals.

Bonawitz was present on the West Front as the police line fell, so there can be no question that he personally witnessed the mob assaulting officers and the efforts that the officers were making to keep the crowd at bay, including deploying chemical agents. Despite seeing all of this violence, Bonawitz was not deterred—instead he chose to make it far worse. His violent, and repeated, assaults on multiple officers are among the worst attacks that occurred that day. His use of his 300-pound frame to tackle two officers to the ground, his lifting of an officer by her neck, and his numerous additional attacks on officers trying to defend themselves and others from the rioters, were barbaric and left his victims with lasting physical, emotional, and psychological injuries. *See* Attachment A, Victim Impact Statement, Sergeant F.R; see also Attachment B, Victim Impact Statement, Detective E.M.[9] The nature and circumstance of Bonawitz's offenses were of the utmost seriousness, and fully support the government's recommended sentence.

### B.  Bonawitz's History and Characteristics

Bonawitz has no criminal convictions and has never been arrested. However, he has been associated with extremist groups. Bonawitz was a member of the Miami chapter of the Proud Boys,

---

[9]  In the time since January 6, 2021, Officer E.M. has been promoted to the rank of detective with the Metropolitan Police Department.

a far right group whose national chairman and senior leaders Judge Kelly recently sentenced to more than seventy cumulative years in prison after they were convicted of seditious conspiracy. *United States v. Nordean, et al.*, 21-cr-175. Throughout 2021 and 2022, Bonawitz attended various Proud Boys and "Floridians First" events in South Florida. In photographs from these events, Bonawitz can be seen laughing and smiling with Enrique Tarrio, the former national chairman of the Proud Boys who is now serving the longest prison term imposed thus far in any case connected to January 6. Bonawitz also continued to associate with the Proud Boys after January 6, 2021, once their violent aims had become readily apparent. In fact, Bonawitz's appearance on an event flyer advertising a meet-up for Proud Boys that was circulating in South Florida in the spring of 2022 is what led to him being identified in this case. More than a year after their role in the January 6 attack on the Capitol was well-known, Bonawitz continued to not only associate with the Proud Boys but was also in their promotional materials. While Bonawitz has a First Amendment right to free speech and freedom of association, his affiliation with the Proud Boys is properly considered as a Section 3553 factor because of the close connection between the nature of the group with which he was associated, their seditious activities, and the conduct for which Bonawitz has pled guilty. Although he was not a part of the Proud Boy's organized activities in D.C. on January 6, he fully embraced and embodied their anti-government, extremist ideology when he assaulted six law enforcement officers who stood between a mob and the democratic process.

Bonawitz also took early efforts to obstruct the case and mislead the FBI. Sometime after January 6, he deleted some of his social media, which is known to have contained evidence of his presence in Washington. By doing so, Bonawitz destroyed crucial evidence about his planning for

the events of January 6 as well as his activities on the ground in D.C., as existing screenshots demonstrate that he discussed both on Facebook. After he was identified as having been present in Washington, he lied to the FBI about his conduct that day during a non-custodial interview, denying both that he engaged in violence and that he entered restricted grounds.

Even since entering his plea of guilt, Bonawitz has demonstrated himself to be without remorse for the events of January 6 and the crimes he committed that day. In his public interview that was viewed nearly 2,600 times, he denied that he ever choked anyone on January 6 or struck any police officers. He expressly called these objective facts, which are established by clear video evidence, "lies." He further tried to minimize his own culpability for the violence that occurred that day by blaming "agitators" who caused him to do violence rather than acknowledging that he was the one who assaulted police officers in the West Plaza. He characterized his tackle of two Capitol Police officers, which left one of them with serious, continuing injuries, as a "rugby match." He went on to speculate that January 6 was a "set up" and answered "absolutely" to the baseless assertion that those who are truly responsible for the violence that day are sitting at home on their couch. The statements in Bonawitz's very recent interview echo the statements that he made to various media outlets as he was leaving the Capitol, wherein he identified himself by name and gave vivid, self-serving, and misleading descriptions of the riot that were designed to attribute blame to the police. Bonawitz gave these interviews as he was leaving Capitol grounds because he was proud of his involvement with the events that day and he was proud of his efforts to overwhelm the police protecting the Capitol. His October 2023 "Flip the Switch" interview echoes the pride that he felt walking away from the Capitol on January 6, 2021, and demonstrates

that any remorse that he now claims to feel is simply remorse because he got caught and is now facing incarceration.

Bonawitz's history and characteristics support a lengthy term of incarceration. He associated with extremist groups who were intimately connected to the violence at the United States Capitol on January 6 and, although he acted separate and apart from the organized activities of the Proud Boys on Capitol Grounds, contributed in kind to the violence that those associated with that group brought to Washington that day. Early in the investigation, he tried to obstruct the investigation by lying to the FBI and deleting his Facebook records, which he knew to contain evidence against him. He continued this pattern of trying to evade blame after his plea agreement when he gave his "Flip the Switch" interview and characterized the statements to which he swore in the statement of offense as "lies." The totality of the evidence in this case clearly shows that Bonawitz is someone who engages in violence when it suits him, tries to evade consequences for his decision to engage in violence, and will lie when he feels it is in his best interest to do so. All these factors support a 71-month term of incarceration.

**C.** **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law.**

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Bonawitz's conduct on January 6 was the epitome of disrespect for the law and our constitutional process.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant weighs in favor of a 71-month term of incarceration. As stated above, Bonawitz engaged in egregious violence against police officers that day despite having multiple opportunities to walk away from the scene and disengage with police. However, more importantly, since entering his plea of guilty Bonawitz has shown himself to not accept responsibility, much less demonstrate remorse, for the shocking violence that he unleashed in the West Plaza that day.. Any remorse that Bonawitz shows to this Court at sentencing should be viewed with extreme skepticism because he has demonstrated a willingness to lie and mislead whenever he feels it is advantageous. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he

---

[10]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

did. And that is when he felt remorse, and that is when he took responsibility for his actions.")
(statement of Judge Chutkan). Now, with many loud voices in the media and online continuing to
sow discord and distrust, the potential for a repeat of January 6 looms ominously in this election
year, and the Court must sentence Bonawitz in a manner sufficient to deter him specifically, and
others generally, from going down the road again.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens
of thousands of sentences and worked with the help of many others in the law enforcement
community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United
States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and
adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying
with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)
(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity
courts lack to base its determinations on empirical data and national experience, guided by
professional staff with appropriate expertise," and "to formulate and constantly refine national
sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give
"respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid
unwarranted sentence disparities among defendants with similar records who have been found
guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range,

differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[12]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the government has selected cases that it believes to be suitable comparisons to the relevant sentencing considerations in this case. Bonawitz's case has many factors that distinguish it from other Capitol riot cases: the ferocity of the assaults, the number of assaults, the lasting injuries that his assaults caused, and the relatively short period of time in which he

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

committed the assaults would—each taken independently—set Bonawitz apart from the vast majority of Capitol riot cases. When taken together, though, they place him into a class of his own. Although Bonawitz's extreme violence distinguished him from most defendants who have been sentenced in connection with January 6, the following two cases are instructive as comparators.

In *United States v. James McGrew*, 21-cr-398 (BAH), McGrew was convicted of one count of violating 18 U.S.C. § 111(a). McGrew, like Bonawitz, participated in an assault on officers at a critical juncture during the riot. Unlike Bonawitz's multiple assaults against individual officers, McGrew assaulted a group of officers in the Lower West Terrace Tunnel. Bonawitz, unlike McGrew, came armed with a weapon, whereas McGrew stole officers' batons while assaulting them. Like Bonawitz, McGrew appeared on a podcast and denied certain aspects of his statement of offense, but, unlike Bonawitz, McGrew denied these facts just before entering a plea rather than after. Unlike Bonawitz, McGrew was convicted of only one violation of 18 U.S.C. § 111(a)(1), but had a higher criminal history score than Bonawitz, and so faced a sentencing range of 70 to 87 months. In sentencing McGrew, Judge Howell remarked that his conduct "really stands out" and was "much more serious" than many January 6 cases she had seen. Ultimately, Judge Howell sentenced McGrew to 78 months of incarceration.

In *United States v. Joseph Padilla*, 21-cr-214 (JDB), Padilla was convicted after trial of violations of 18 U.S.C. 231(a)(3) and one count of 18 U.S.C. 111(a) and (b).  Padilla, like Bonawitz, assaulted numerous officers on the West Front of the Capitol and was instrumental in the mob ultimately overrunning the police line. Unlike Bonawitz, Padilla used a dangerous weapon in his assaults against police officers, but, unlike Bonawitz who carried two knives, Padilla's

weapon was a flagpole and, therefore, not dangerous *per se*. Because Padilla went to trial, he, like Bonawitz, was not entitled to any reduction for acceptance of responsibility.[13] Judge Bates sentenced Padilla to 78 months of incarceration.

## VI.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[14] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Bonawitz must pay $2,000 in restitution, which reflects in part

---

[13] Padilla also received a two-level increase under U.S.S.G. § 3C1.1 for false testimony at trial.

[14] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

the role he played in the riot on January 6.[15] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD. Bonawitz's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 127.

## VII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 71 months of incarceration, three years of supervised release, restitution of $2,000, and a mandatory assessment of $300.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     *s/ Sean P. McCauley*
SEAN P. McCAULEY
Assistant United States Attorney
New York Bar No. 5600523
United States Attorney's Office
For the District of Columbia
601 D Street, NW
Washington, DC 20530
Sean.McCauley@usdoj.gov

---

[15] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).